# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **MARGRIT EAKIN**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **Case No. 09 CV 2823** |
| | ) | |
| **MICHAEL J. ASTRUE**, | ) | **Magistrate Judge Young B. Kim** |
| *Commissioner of Social Security*, | ) | |
| | ) | |
| Defendant. | ) | **July 15, 2010** |

## MEMORANDUM OPINION and ORDER

Before the court are the parties' cross-motions for summary judgment. Plaintiff Margrit Eakin ("Eakin") seeks review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for a period of disability and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. § 423(d)(2). Eakin asks the court to reverse the Commissioner's decision and award benefits, or in the alternative, remand the decision for further proceedings. The Commissioner seeks an order affirming the decision. For the following reasons, Eakin's motion for summary judgment is denied and the Commissioner's motion for summary judgment is granted:

### Procedural History

Eakin applied for DIB on January 19, 2006, alleging that she became disabled on August 31, 2004, due to severe arthritis and pain in her left hip. (Administrative Record ("A.R.") 113-15, 131.) Her application was denied initially on April 27, 2006, and again on

reconsideration on September 8, 2006.  (Id. at 62-65, 69-73.)  Thereafter, Eakin filed a timely

request for a hearing on September 29, 2006.  (Id. at 74.)

An administrative law judge ("ALJ") held a hearing on November 14, 2007.  (A.R.

15-59.)  Eakin appeared and testified at the hearing.  (Id. at 17-43.)  James Radkey

("Radkey"), a vocational expert ("VE"), also appeared and testified at the hearing.  (Id. at 43-

59.)  On November 4, 2008, the ALJ issued a decision finding Eakin not disabled.  (Id. at 8-

14.)  Eakin then filed a request for review of the ALJ's decision but, on March 20, 2009, the

Appeals Council denied her request, making the ALJ's decision the final decision of the

Commissioner.  (A.R. 1-3.)  Pursuant to 42 U.S.C. § 405(g), Eakin initiated this civil action

for judicial review on May 7, 2009.

## Facts

Eakin was born on March 18, 1946, and was 61 years old at the time of the

administrative hearing.  (A.R. 21-22.)  She went to school in Germany, where she completed

the eighth grade and attended business college for one year.[1]  (Id. at 22-23.)  Eakin also

completed two years of school in the United States, but she does not have a high school

diploma or general equivalency degree.  (Id.)  Eakin was most recently employed as a

waitress, and stopped working on August 31, 2004.  (Id. at 23-24, 131-32.)

---

[1]  In Germany, college is the level of schooling that follows directly after eighth grade.  (A.R. 22-23.)

## A. Medical Evidence

On May 20, 2005, Eakin sought treatment from Dr. Joanna Sala, a family physician, for high blood pressure and knee pain. (A.R. 193-94.) Eakin's blood pressure was 130/80 and she weighed 209.5 pounds. (Id. at 193.) Dr. Sala prescribed her Mobic and Celebrex, non-steroidal anti-inflammatory medications, for her knee pain. (Id. at 194.) Dr. Sala again treated Eakin on June 9, 2005, at which time she complained of left knee pain, and exhibited crepitation (grinding or creaking) on range of motion. (Id. at 195-96.) She was assessed with left knee pain and referred to an orthopedic surgeon. (Id. at 196.)

Eakin saw Dr. Dennis Mess, an orthopedic surgeon, on June 15, 2005. (A.R. 213.) She told Dr. Mess that she had fallen on her left side one month earlier and was experiencing left hip and thigh pain. (Id.) Dr. Mess noted that Eakin walked with an antalgic left limp and had a negative 10 degree extension of her left hip, but otherwise had a full range of motion in her left hip joint. (Id.) He reported x-ray evidence of severe degenerative joint disease of Eakin's left hip, and prescribed Voltaren, a non-steroidal anti-inflammatory medication. (Id. at 213, 215.)

Eakin returned to Dr. Mess on August 1, 2005, reporting that her symptoms had improved with Voltaren, but other medications had been more effective. (A.R. 213.) Treatment notes indicate that she was "not ready for surgery" and that she was prescribed Mobic. (Id. at 213, 214.) About six months later, on January 19, 2006, Eakin applied for disability benefits. (Id. at 113-15.)

Eakin attended a consultative examination on April 18, 2006, with Dr. Liana Palacci, an osteopathic physician. (A.R. 197-200.) She complained she had left hip pain that radiated to her anterior thigh and knee for the past six years. (Id. at 197.) She explained that she had morning stiffness that lasts for about an hour and then improved with activity, and that sitting and walking for prolonged periods exacerbated her pain. (Id.) Eakin stated that her hip pain was worse with rainy weather and she had difficulty bending. (Id.) She gets left leg weakness and trips occasionally and, as a result, uses a cane for balance. (Id.) Eakin has difficulty climbing stairs and needs to take one step at a time. (Id.) She said that surgery had not been offered as an option, and she took Voltaren and other medication to alleviate her pain. (Id.)

Dr. Palacci found that Eakin's range of motion in her left hip was reduced to 70/100 degrees on flexion and 10/30 degrees on extension with pain, and her range of motion in her lumbar spine was reduced to 70/90 degrees on flexion and 10/30 degrees on extension. (A.R. 199.) Eakin's gait was antalgic where she favored the left leg. (Id.) She was, however, able to do tandem gait, and her range of motion in her knees and ankles was normal. (Id.) She had difficulty with knee squats and was unable to heel/toe stand on her left leg. (Id.) Eakin's reflexes were decreased bilaterally at 1/4, and her left leg strength was reduced at 4/5. (Id.) Dr. Palacci noted Eakin had difficulty getting on to the examination table, but had no difficulty rising from a chair. (Id.) Eakin did not need a cane to ambulate 50 feet. (Id.)

Dr. Palacci diagnosed osteoarthritis of the left hip with decreased strength and range of motion, and poorly controlled hypertension.  (Id. at 200.)

A week later, on April 25, 2006, Dr. Frank Jimenez, a state agency physician, reviewed Dr. Palacci's findings from the consultative examination and completed a Physical Residual Functional Capacity Assessment.  (A.R. 201-08.)  Dr. Jimenez opined that Eakin was capable of performing light work with certain postural limitations, which included no climbing and only occasional balancing, stooping, kneeling, crouching, and crawling.  (Id. at 202-03.)  The Commissioner denied Eakin's request for benefits on April 27, 2006.  (Id. at 62-65.)  On September 6, 2006, Dr. Charles Kenney, another state agency physician, reviewed Eakin's medical file and affirmed Dr. Jimenez's assessment. (Id. at 221-22.)  Two days later, on September 8, 2006, the Commissioner denied Eakin's benefits on reconsideration.  (Id. at 69-73.)

The following year, on September 21, 2007, Eakin complained to Dr. Mess that her left hip was slowly getting worse, but she wanted to continue taking medications and would consider having hip replacement surgery in 2008.  (A.R. 225.)  Dr. Mess noted that Eakin walked with a slight limp.  (Id.)

Dr. Mess completed a Medical Report and Physical Capacities Assessment on November 14, 2007.  (A.R. 226-29.)  In the Medical Report, Dr. Mess diagnosed Eakin as having osteoarthritis of the left hip, with findings of limited and painful motion in her left hip.  (Id. at 226.)  He opined that her complaints of severe pain were credible and consistent

with his findings. (Id. at 227.) Dr. Mess reported that Eakin's impairment would last indefinitely and that she needed a hip replacement. (Id.) Next, in assessing Eakin's ability to work in an eight-hour day on a sustained basis, Dr. Mess opined that she was able to sit for one hour, stand and/or walk for less than one hour, and occasionally lift up to ten pounds. (Id. at 228.) Dr. Mess opined further that Eakin was not able to use her feet for repetitive movements, and required complete freedom to rest frequently without restriction. (Id. at 229.)

## B.    Eakin's Testimony

Eakin testified that she last worked in 2004, as a waitress in a restaurant. (A.R. 23.) She worked as a waitress for four years where she carried trays weighing 25 pounds and was on her feet all of the time. (Id. at 23-24.) Eakin stopped working as a waitress because she could not move and was always in pain. (Id. at 29.) At that time, she took a lot of aspirin just to get through the day, and she did not know what was wrong with her. (Id. at 29-30.)

She explained that most of her previous jobs had been waitress jobs, but she also worked as a cashier at a currency exchange and a stocker at a retail store. (A.R. 24-25.) As a cashier, her duties included cashing checks, sending faxes, wiring money, putting away large boxes of coins in a safe, balancing the books, cleaning, and washing floors. (Id. at 26.) While working as a cashier, Eakin would alternate between sitting for about half of each hour and standing for the other half. (Id.) Even in the intervals where she sat, she was constantly getting up and down to complete various tasks. (Id. at 27.)

Eakin stated that she could no longer work in her former position as a cashier because it takes her too long to stand up and balance on her legs. (A.R. 27.) She testified that walking to the fax machine would be difficult without holding on to anything, and standing waiting for a fax would take too long and she would need to sit down, but there would be nowhere to sit. (Id.) Eakin said that she would no longer be able to carry, bend over, and place the boxes of coins, weighing 25 pounds, into the safe. (Id. at 28-29.)

She testified that her pain is never gone and it radiates from her left hip into her knee and back. (A.R. 31.) The pain feels like there is constantly a "knife stuck in [her]." (Id. at 31-32.) Voltaren provides some pain relief, but it takes two hours for the medicine to work. (Id. at 32.) She indicated that the medicine would provide some relief while she was sitting, but when she stood the pain was always there. (Id.)

Eakin explained that she can sit for maybe 15 or 20 minutes, but would then need to stand up because she has pain. (A.R. 34-35.) She described her difficulty in standing up from a sitting position, and her need while standing to hold onto whatever object was available in an effort to counteract her pain. (Id. at 34.) Eakin testified that when she first stands up, the pain feels like someone hit her in the back of the knee and she feels like collapsing. (Id.) She stated that when the pain finally subsides, she can slowly begin to walk, but she needs to sit down again before long. (Id. at 34-35.) Eakin has to alternate constantly between sitting and standing due to her pain. (Id. at 35.) She stated that she has trouble sleeping because of her pain and tosses and turns most of the night. (Id. at 32-33.)

Eakin explained her need to elevate her legs because her legs and feet swell due to poor circulation, and described her use of a heating pad, hot showers, and topical medication to help alleviate her pain.  (Id. at 40-41.)  Furthermore, she testified that she has very few good days and has more pain when the weather changes.  (Id. at 37.)

With regard to daily activities, Eakin testified that a task that used to only take her one hour to do now takes almost eight hours.  (A.R. 37.)  She can wash only a couple of dishes before she has to sit down because her back hurts.  (Id.)  Eakin is only able to clean one room each day.  (Id.)  When performing household chores, she needs to rest for 15-minute periods every hour.  (Id. at 155.)  She has difficulty with personal hygiene because she cannot get out of a bath tub and has to use a walk-in shower with safety railings.  (Id. at 33.)  Eakin also testified that she needs a cane or walker to help her get around.  (Id. at 36, 41-42.)

Eakin related that Dr. Mess advised her that he did not think a hip replacement would be beneficial because she has a genetic hip disease.  (A.R. 38.)  He offered to perform the hip replacement surgery, but he could not guarantee that it would work.  (Id.)  Dr. Mess further explained to Eakin that there was nothing more that could be done for her condition.  (Id.)  On November 26, 2007, Eakin's attorney sent a letter to the ALJ stating that Eakin had discussed hip replacement surgery with Dr. Mess and he did not know if it would work due to genetic factors.  (Id. at 183.)  However, Eakin's attorney pointed out that Dr. Mess's "caution is not reflected in his notes or the Medical Report."  (Id.)

## C.   Vocational Expert's Testimony

Radkey testified that Eakin's past work as a cashier is typically performed at the sedentary level and is semi-skilled work.  (A.R. 44.)  He stated that an individual who performs this type of work would need to maintain a sedentary position for about 20 minutes, and stand for a maximum of about five minutes.  (Id.)  Radkey explained that if an individual needed a cane to ambulate, it would be considerably more difficult to perform the cashier job because much of the time that individual would be carrying things while also needing to maintain good balance.  (Id.)  If an individual were using a cane, that individual could still perform some of the cashier jobs, but not all of them.  (Id. at 45.)  Radkey testified that there are 19,800 semi-skilled sedentary cashier positions in northeastern Illinois.  (Id.)  He estimated that the number would be reduced to 8,000 if an individual needed to use a cane.  (Id.)  Radkey told the ALJ that his testimony was consistent with the Dictionary of Occupational Titles ("DOT").  (Id. at 46.)

When questioned by Eakin's attorney, Radkey testified that he did not have the DOT number for the sedentary cashier jobs with him at the hearing.  (A.R. 46-47.)  Eakin's attorney explained that the DOT number she had for cashier jobs entailed light work except for one check-cashier job, which was sedentary.  (Id. at 47.)  Radkey stated that he was referring to this same sedentary cashier job classification and believed it was consistent with Eakin's prior positions.  (Id. at 48.)  He indicated that he obtained the 19,800 figure from the Occupational Employment Quarterly, using the Chicago-Naperville-Joliet area data, and

those figures were in turn based on data from the Bureau of Labor Statistics and the Census Bureau. (Id. at 49.) Radkey showed Eakin's attorney where the 19,800 figure for the sedentary cashier jobs figure was listed in that publication. (Id.) He further explained that he calculated the 8,000 figure by reducing the original 19,800 figure by 60 percent to give Eakin the benefit of the doubt because there might be some jobs that would be too difficult for her to perform. (Id. at 51.)

**D.      The ALJ's Decision**

The ALJ issued a decision finding that Eakin was not disabled within the meaning of the Act. (A.R. 23.) The ALJ initially determined that Eakin had met the insured status requirements under the Act through December 31, 2009. (Id. at 10.) Next, the ALJ found that Eakin had not engaged in substantial gainful activity since August 31, 2004, the alleged onset date of her disability. (Id.)

The ALJ found that the medical evidence established that Eakin suffered from arthritis in her left hip, obesity, and hypertension. (A.R. 10.) However, the ALJ determined that Eakin did not have an impairment or combination of impairments listed in, or medically equal to one listed in the regulations. *See* 20 C.F.R. § 404, Subpt. P, App. 1. (Id.) The ALJ then assessed Eakin's residual functional capacity ("RFC") to determine what work she could perform despite her limitations. (Id. at 10-14.) The ALJ found that Eakin could perform the full range of sedentary work. (Id. at 10.)

In reaching this conclusion, the ALJ discussed Eakin's medical history and found that, although she alleged that she became unable to work on August 31, 2004, she did not seek medical treatment until the following year in May 2005. (A.R. 12.) The ALJ relied on treatment notes from June 2005, stating that Eakin fell on her left side one month earlier, which implied that her symptoms and limitations began at least eight months after her alleged onset date. (Id.) Next the ALJ found that while Eakin received some treatment for her left hip impairment, it was essentially routine and conservative in nature, consisting only of medications. (Id.) Furthermore, because Eakin reported to Dr. Mess that she was not ready for surgery, she could live with her hip pain, and she would consider a hip replacement the following year, the ALJ found that her condition was not as severe as she alleged. (Id.)

The ALJ found Eakin's allegations of disabling limitations not credible because of her infrequent treatment or visits to her physicians. (A.R. 12.) For instance, she only saw a physician annually since 2005, and only saw Dr. Mess a total of four times. (Id. at 12-13.) The record further showed that Eakin never attended physical therapy or had injections for her pain. (Id. at 13.) The ALJ also noted that an x-ray of Eakin's left hip was never submitted and there was no indication that the use of a cane or walker had been prescribed or even suggested. (Id.)

The ALJ gave little weight to the opinions of Drs. Mess and Jimenez because he did not view either opinion as credible in light of the medical evidence. (A.R. 13.) The ALJ discredited Dr. Jimenez's opinion because he failed to explain how the medical findings

supported a finding that Eakin is able to stand and walk six-hours in an eight-hour workday. (Id.)  The ALJ found Dr. Mess's opinion that Eakin is limited to working substantially less than an eight-hour workday without support because it was based on Eakin's own subjective complaints and limitations, and there was no basis for his opinion in his treatment notes. (Id.)

The ALJ concluded that Eakin was capable of performing her past relevant work as a cashier.  (A.R. 13-14.)  In reaching this conclusion, the ALJ relied on Radkey's testimony that a sedentary cashier job as normally performed would allow an individual to change positions every 20 minutes and stand for only 5 minutes at a time.  (Id.)  Therefore, notwithstanding Eakin's limitations, the ALJ determined that a significant number of jobs existed in the national economy that she could perform.  (Id. at 14.)

## Analysis

Eakin seeks reversal or remand of the ALJ's decision finding that she is not disabled. Upon review of the record and applying the applicable standards, the court finds that the ALJ's decision is supported by substantial evidence.  Here, the ALJ properly assessed Eakin's RFC and credibility, she reasonably rejected Dr. Mess's opinion, and she appropriately relied on the VE's testimony.  Therefore, the court affirms the ALJ's decision in its entirety.

## A.    Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one: the court must affirm the decision if it is supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  The court may not reevaluate the facts, reweigh the evidence, or substitute its judgment for that of the Social Security Administration.  *Binion on Behalf of Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).  Where conflicting evidence would allow reasonable minds to differ as to whether a plaintiff is disabled, the Commissioner has the responsibility for resolving those conflicts. *Id.*  Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, and the error is not harmless, the court must reverse the decision regardless of the evidence supporting the factual findings.  *Id*.

While the standard of review is deferential, the court "must do more than merely rubber stamp" the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (citations omitted).  In order for the court to affirm a denial of benefits, the ALJ must have articulated the reasons for the decision at "some minimum level." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  This means that the ALJ "must build an accurate and logical bridge from the evidence to [the] conclusion." *Id.*  Although an ALJ need not address every piece of evidence, the ALJ cannot limit her decision to only that evidence that supports

her ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of her findings and afford the plaintiff a meaningful judicial review. *Scott*, 297 F.3d at 595.

## B.    Five-Step Inquiry

To qualify for DIB under Title II, a claimant must establish that she has a disability within the meaning of the Act. 42 U.S.C. §§ 423(a)(1)(D), 1382(a). An individual is "disabled" if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R.§ 404.1505(a); *Skinner v. Astrue*, 478 F.3d 836, 844 (7th Cir. 2007). The Social Security Regulations set forth a five-step sequential inquiry for determining whether a claimant is disabled. The ALJ must consider whether:

> (1) the claimant is presently [un]employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves [her] unable to perform [her] past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy.

*Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005) (citing 20 C.F.R. § 404.1520).

An affirmative answer to each step leads either to the next step or, at steps three and five, to a finding that the claimant is disabled. 20 C.F.R. § 404.1520; *Briscoe*, 425 F.3d at

14

352. A negative answer at any point, other than step three, terminates the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. § 404.1520; *Stein v. Sullivan*, 892 F.2d 43, 44 (7th Cir. 1989). The claimant bears the burden of proof through step four. *Briscoe*, 425 F.3d at 352. And, if all four steps are met, the burden shifts to the Commissioner at step five. *Id.* The Commissioner must then establish that the claimant—in light of her age, education, job experience and RFC to work—is capable of performing other work and that such work exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1520(f).

## C.    RFC Finding

Eakin first contends that the ALJ ignored relevant medical evidence and failed to discuss in any meaningful way how the clinical evidence she cited supports her sedentary RFC finding. (Pl.'s Mem. at 8-9.) She further avers that the ALJ ignored Dr. Mess's x-ray evidence of her severe arthritis in her left hip and failed to explain how Dr. Palacci's findings of a limited range of motion in her left hip and loss of strength in her left leg show that she is capable of performing sedentary work. (Id. at 8.) The Commissioner, on the other hand, contends that the ALJ's RFC finding is supported by the opinions of Drs. Jimenez and Kennedy, state agency reviewing physicians, who found that Eakin was capable of performing light work. ( Def.'s Resp. at 5.) The Commissioner asserts that the ALJ properly discussed the medical evidence, including the few abnormal findings, and reasonably concluded that Eakin could perform sedentary work. (Id. at 6.) The Commissioner further

avers that the ALJ did not discuss Dr. Mess's reported x-ray evidence because Eakin never produced that evidence. (Id. at 6-7.)

The court finds that the ALJ's RFC finding is based on substantial evidence and supported by the record. Social Security Ruling ("SSR") 96-8p states in relevant part:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

SSR 96-8p, 1996 WL 374184, at *7; *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009) ("In determining an individual's RFC, the ALJ must evaluate all limitations that arise from medically determinable impairments . . . and may not dismiss a line of evidence contrary to the ruling.").

Here, the ALJ found that "the objective medical evidence does not provide a basis for finding limitations greater than those determined in this decision." (A.R. 12.) In assessing Eakin's RFC, the ALJ considered both the normal and abnormal medical findings and reasonably concluded that Eakin is capable of performing sedentary work. For instance, the ALJ discussed Dr. Palacci's abnormal findings showing that Eakin: (1) had some decreased range of motion of the lumbar spine and left hip; (2) walked with an antalgic gait favoring her left leg; (3) had difficulty doing knee squats; (4) was unable to heel/toe stand on the left,

and (5) had some difficulty getting on the examination table. (Id.) The ALJ noted that Dr. Palacci diagnosed osteoarthritis of the left hip with decreased strength and range of motion. (Id.) The ALJ also considered Dr. Mess's abnormal findings, including Eakin's negative 10 degree extension of the left hip and her antalgic left limp. (Id. at 11.) Dr. Mess diagnosed severe degenerative joint disease of the left hip, prescribed pain medications, and recommended a hip replacement.[2] (Id.) Furthermore, the ALJ considered the findings of Drs. Jimenez and Kinney, the state agency reviewing physicians, who found that Eakin could perform activities consistent with light work, but with certain stated limitations. (Id. at 13.) Therefore, the ALJ's RFC finding is sufficient because she reasonably considered the relevant medical findings and any functional limitations in finding that Eakin can perform sedentary work. *See* SSR 96-8p ("The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence.")

## D. Credibility Finding

Eakin next contends that the ALJ failed to make a proper credibility determination and the evidence she relies on does not support her conclusion. (Pl.'s Mem. at 9-12.) She asserts that the ALJ's reasons for finding her not credible, which included the onset date of her disabling condition, the conservative nature of her medical treatment, and her use of a cane

___

[2]  To the extent that Eakin contends that the ALJ failed to explicitly consider Dr. Mess's reported x-ray evidence, she has not shown how that evidence establishes that she has an impairment beyond what the ALJ found.

and walker do not establish that she is exaggerating her pain symptoms and physical limitations. (Id. at 9-11.) Eakin also argues that the ALJ erroneously failed to assess her daily activities, the duration, frequency, and intensity of her pain, any precipitating and aggravating factors that cause pain, and the measures she uses to relieve her pain in assessing her credibility. (Id. at 11-12.)

The Commissioner, on the other hand, asserts that substantial evidence supports the ALJ's credibility finding because Eakin only sought routine medical treatment, and refused to have hip replacement surgery. (Def.'s Resp. at 8-11.) The Commissioner avers that the ALJ properly found that Eakin's allegations of disabling pain and severe limitations were undercut by her admission that she can live with the pain. (Id. at 9-10.) Furthermore, the Commissioner argues that the ALJ found Eakin's use of a cane or walker not credible because they were neither medically prescribed nor recommended by her physicians. (Id. at 10.)

The court finds that the ALJ properly assessed the credibility of Eakin's testimony at the hearing. An ALJ's credibility finding will be afforded "considerable deference" and overturned only if it is "patently wrong." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) (citations omitted). "A credibility assessment is afforded special deference because an ALJ is in the best position to see and hear the witness and determine credibility." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000) (citation omitted). However, where the credibility determination is based on objective factors rather than subjective considerations,

an ALJ is in no better position than the court and the court has greater freedom to review it. *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). The Social Security Ruling instructs that the ALJ's written decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186, at *2; *see also Brindisi v. Barnhart,* 315 F.3d 783, 787 (7th Cir. 2003).

Eakin contends that the ALJ's credibility determination is flawed because Dr. Mess's reported x-ray evidence establishes that her hip impairment began long before she sought medical treatment. (Pl.'s Mem. at 10.) The ALJ found Eakin's testimony of disabling pain not credible in part because she did not seek medical treatment for her left hip impairment until June 2005, even though she alleges she was unable to work on August 31, 2004. (A.R. 12.) The ALJ considered that Eakin first sought treatment from Dr. Mess a month after she had injured herself in a fall, which implied to the ALJ that her symptoms and limitations did not begin until at least eight months after her alleged onset date. (Id.) Because Eakin provided no evidence that her left hip impairment existed prior to her fall, the ALJ considered this timing as one factor pointing to a conclusion that Eakin's claims were not fully credible.

The ALJ also found Eakin's testimony not credible because the ALJ found that her medical treatment has been routine and conservative in nature, consisting essentially of

medications.  (A.R. 12.)  Contrary to Eakin's contention that the ALJ failed to discuss the

factors delineated in SSR 96-7p, the ALJ reasonably considered the most relevant aspects of

Eakin's testimony and concluded that her pain allegations were not as limiting as she alleged

because the medical evidence does not support her allegations and she only sought routine

or conservative medical treatment for her pain.  For example, the ALJ explained:

> The possibility of surgery was mentioned in Dr. Mess's notes, which state [the]
> claimant was not ready for surgery . . . or that she would consider a total hip
> replacement the next year . . . but the claimant instead chose to continue
> conservative treatment with medication, an indication that her condition is not
> as severe as alleged.  She even stated that she 'can live with' the pain . . . again
> indicating it is not as severe as alleged.

(Id.)  The ALJ noted that Eakin has seen her physicians relatively infrequently since she only

went to the doctor once a year and saw Dr. Mess a total of only four times.  (Id. at 12-13.)

The ALJ further discussed that Eakin did not have physical therapy or injections to relieve

her pain.  (Id. at 13.)

The ALJ reasonably relied on Eakin's routine or conservative medical treatment in

finding her testimony not credible.  First, Eakin's treatment history consisted of just six office

visits over a three-year period.  She had four visits in 2005, one visit in 2006, and one visit

in 2007.  An ALJ may reasonably find that a claimant's allegations of disabling pain are not

credible where the claimant seeks little treatment.  *Luna v. Shalala*, 22 F.3d 687, 691 (7th

Cir. 1994) ("In light of Luna's . . . failure to seek further medical assistance despite his claim

of incapacitating pain, the ALJ found Luna's complaints of pain exaggerated.").

Second, Eakin was neither prescribed physical therapy nor referred to a pain clinic to manage her pain. She also did not have any additional diagnostic tests, including computerized tomography or magnetic resonance imaging scans, and she only took aspirin prior to June 2005. Thus, these conservative measures that were used to evaluate and treat Eakin significantly undercut her complaints of disabling symptoms and limitations. *See* 20 C.F.R. § 404.1529(c)(3)(v) (noting that a claimant's medical treatment is one factor used to evaluate pain symptoms); *Howard v. Sullivan*, 950 F.3d 343, 348 (7th Cir. 1991) (finding the clamant's use of aspirin undercut his complaints of disabling pain). Furthermore, Eakin refused Dr. Mess's recommendation to undergo hip replacement surgery telling Dr. Mess that she only wanted to take medications and that she "can live with [the pain]." (A.R. 225.) Given Eakin's reluctance to pursue aggressive treatment and her representation that she could cope with her pain, the ALJ's conclusion that her description of her pain at the hearing was exaggerated is supported by the record.

Eakin also contends that the ALJ erred in finding that her use of a cane and walker undermine her credibility. (Pl.'s Mem. at 11.) Here, the ALJ found that Eakin had exaggerated her symptoms and limitations because she used a cane and walker even though these devices had not been prescribed by her physicians. (A.R. 13.) This very conclusion was indeed rejected in *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009). In *Terry*, the ALJ "placed considerable weight on the fact that no doctor had prescribed a walker for [the claimant], concluding that this showed she had exaggerated her symptoms." 580 F.3d at 477-

78. The Seventh Circuit found that, given the claimant's fibromyalgia and history of back surgery, her "use of a walker, even if a doctor did not recommend it, is not on its own enough to make her testimony regarding her pain unbelievable." *Id.* at 478. In this case, given the multiple credibility factors that are supported by the record, the ALJ's reference to Eakin's use of a cane and walker is harmless. Therefore, because the ALJ's credibility finding is not "patently wrong," she is affirmed on this issue. *See Prochaska*, 454 F.3d at 738.

## E. Dr. Mess's Opinion

Eakin contends that the ALJ failed to explain the weight she gave to Dr. Mess's opinion and that her conclusions regarding his opinion are not based on substantial evidence. (Pl.'s Mem. at 12-14.) Eakin avers that since the ALJ did not give controlling weight to Dr. Mess's opinion, she was required to give deference to his opinion and explain what weight she accorded his opinion and the reasons for that weight. (Id. at 13.) The Commissioner, however, asserts that the ALJ reasonably rejected Dr. Mess's opinion because it was not well-supported by the medical evidence and there is no evidence in his examination findings supporting his opinion that Eakin has difficulty sitting, which is the main requirement for sedentary work. (Def.'s Resp. at 11-13.)

The court finds that the ALJ reasonably rejected Dr. Mess's opinion because he relied on Eakin's subjective reports of limitations and those limitations are not supported by his treatment notes. The regulations state that an ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is "well-supported by medically

acceptable clinical and laboratory diagnostic techniques"; and (2) it "is not inconsistent with the other substantial evidence" in the case. 20 C.F.R. § 404.1527(d)(2); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008); SSR 96-2p, 1996 WL 374188, at *2. If a treating physician's opinion is not entitled to controlling weight, it is accorded deference and must be weighed using the following factors: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion, including medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the treating physician; and (6) any other factors which tend to support or contradict an opinion. 20 C.F.R. § 404.1527(d)(2)-(6). An ALJ may reject a treating physician's opinion if the opinion is unsupported or inconsistent with the evidence in the record, but if the ALJ rejects the opinion, she must give a good reason. 20 C.F.R. § 404.1527(d)(2); *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008).

Here, the ALJ adequately explained her decision to discount Dr. Mess's opinion that Eakin was unable to perform work on a sustained basis. The ALJ correctly pointed out that Dr. Mess "fail[ed] to explain his rationale for stating that [the] claimant is limited to substantially less than an 8-hour workday and there is nothing to support said opinion within his treatment notes." (A.R. 13.) As discussed above, Dr. Mess only saw Eakin four times over a three-year period and his treatment notes contain few abnormal findings. (Id. 213-16, 225.) For instance, he found Eakin walked with an antalgic left limp and had a negative 10

degree extension of her left hip, but otherwise had a full range of motion in her left hip joint.

(Id. at 213, 225.) Because Dr. Mess's conclusions regarding Eakin's limitations were not supported by his examination findings, the ALJ reasonably rejected Dr. Mess's opinion on the basis that he relied on Eakin's reports of subjective complaints in assessing her limitations. *See Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006) ("the fact that the claimant is the treating physician's patient also detracts from the weight of that physician's testimony, since, as is well known, many physicians (including those most likely to attract patients who are thinking of seeking disability benefits) will often bend over backwards to assist a patient in obtaining benefits"); *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001) ("The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability."). Therefore, the ALJ properly explained the reasons for the weight she accorded Dr. Mess's opinion and rejected his opinion.

## F.    Step-Four Finding

Eakin contends that the ALJ's step-four finding is based on unreliable VE testimony and is not supported by substantial evidence. (Pl.'s Mem. at 14-15.) She avers that the ALJ erred in relying on Radkey's testimony that her past work as a currency exchange cashier is sedentary because he was not able to cite the DOT number or produce a copy of the DOT entry when questioned by her attorney. (Id., Pl.'s Reply at 8.) Eakin next asserts that because the DOT does not provide for a sit/stand option in any of its job descriptions,

Radkey's testimony that she could perform her sedentary cashier position with a sit/stand option was inconsistent with the DOT. (Id.)

The Commissioner defends that the ALJ reasonably relied on Radkey's testimony in finding that Eakin could perform her past relevant work as a sedentary cashier. (Def.'s Resp. at 13-14.) The Commissioner points out that Eakin's attorney admitted that the check-cashier job that Radkey testified about was categorized as sedentary work. (Id. at 14.) The Commissioner further asserts that Radkey's testimony was consistent with the DOT because the ALJ did not find that Eakin required a sit/stand option. (Id.)

The court finds that the ALJ's step four finding is based on reliable VE testimony. Under SSR 00-4p, "an ALJ has an 'affirmative responsibility' to ask whether a vocational expert's evidence 'conflicts with information provided in the DOT before relying on that evidence to support a determination of nondisability.'" *Overman v. Astrue*, 546 F.3d 456, 462-63 (7th Cir. 2008). If the VE's testimony appears to conflict with the DOT, SSR 00-4p requires an ALJ to obtain "a reasonable explanation for the apparent conflict." *Id.* at 463.

The ALJ based her step-four finding on Radkey's testimony that Eakin could perform her past relevant work as a sedentary cashier and that there are 19,800 semi-skilled sedentary cashier jobs in northeastern Illinois. (A.R. 14, 44-45.) Radkey reduced that figure to 8,000 jobs to accommodate Eakin's use of a cane. (Id. at 45.) While Eakin claims that Radkey was not able to cite the DOT number or produce a copy of the DOT entry, her attorney admitted that the check-cashier job that Radkey specifically referenced is categorized as sedentary

work in the DOT. (Id. at 46-47.) Furthermore, Radkey stated that he obtained his information about sedentary jobs from the Occupational Employment Quarterly and showed Eakin's attorney where the 19,800 figure for the sedentary cashier jobs was listed in that publication. (Id. at 49.) Accordingly, there was no apparent conflict between Radkey's testimony and the DOT's description of the check-cashier job for the ALJ to have resolved.

Next, Eakin argues that Radkey's testimony conflicts with the DOT because the DOT does not include a sit/stand option as part of its definition of sedentary work. (Pl.'s Mem. at 14-15.) But the ALJ found that Eakin could perform the full range of sedentary work without a sit/stand option. Furthermore, the ALJ found Radkey's testimony that a sedentary cashier position as normally performed would allow Eakin to change positions every 20 minutes and stand for only five minutes each time as consistent with the DOT. (A.R. 13-14.) Therefore, because Radkey's testimony did not conflict with the DOT, the ALJ properly relied on Radkey's testimony in finding that Eakin could perform her past work as a sedentary cashier.

## Conclusion

For the foregoing reasons, Eakin's motion for summary judgment is denied and the Commissioner's motion for summary judgment is granted.

ENTER:

_____

**Young B. Kim**
**U.S. Magistrate Judge**